UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BEAUTY MANUFACTURING SOLUTIONS CORP., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| VS. | ) ) | 3:10-CV-2638-G |
| ASHLAND, INC. d/b/a ASHLAND DISTRIBUTION, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

From January 9, 2012 to January 11, 2012, the court conducted a three-day

bench trial in this case.  The parties presented documentary exhibits and witness

testimony related to the transactions at issue.  Based on this evidence, the court finds

and concludes that the defendant Ashland, Inc. ("Ashland") breached a series of

contracts with the plaintiff Beauty Manufacturing Solutions Corporation ("Beauty

Manufacturing") and must pay a total of $231,016.43 in damages.  Additionally, the

court finds that Ashland did not breach any express warranties and did not violate

any provisions of the Texas Deceptive Trade Practices Act.

## I.  FINDINGS OF FACT

This is a contract dispute.  Beauty Manufacturing manufactures a creme-to-powder product ("the CTP product") for Mary Kay Inc. ("Mary Kay").  Ashland is a distributor of Dow Corning Corporation ("Dow Corning") products.  Beauty Manufacturing and Ashland entered into a series of sale contracts concerning a necessary ingredient for the manufacture of the CTP product.  However, due to some confusion, Beauty Manufacturing received a different ingredient than the one that it needed to properly manufacture the CTP product.  As a result, for over a year and a half, Beauty Manufacturing used the wrong ingredient to manufacture the CTP product.  Beauty Manufacturing brought this suit against Ashland to recover damages for the injury it suffered from this mixup.

In the early part of 2007, Beauty Manufacturing agreed to manufacture the CTP product for Mary Kay.  At that time, Mary Kay provided Beauty Manufacturing with raw specification sheets for the various chemicals to use in manufacturing the CTP product.  One of these sheets was for "Dimethicone & Trimethylsiloxysilicate" ("Dimethicone").  This specification sheet stated that the Mary Kay item number for Dimethicone was 50056600.  In addition, it stated that Dow Corning was an approved manufacturer and supplier of Dimethicone, and that the Dow Corning trade name for Dimethicone was "DC 593."

Before it began to manufacture the CTP product for Mary Kay, Beauty Manufacturing made a pilot batch of it from materials sent directly from Mary Kay. One of the materials that Mary Kay sent to Beauty Manufacturing was Dimethicone. Because it was able to prepare the pilot batch successfully, Beauty Manufacturing went ahead to manufacture the CTP product.

On July 6, 2007, Mike Sterling, director of purchasing at Beauty Manufacturing, e-mailed Doug Krysiak at Dow Corning about pricing information on "Dimethicone & Trimethylsiloxysilicate- MK item #50056600." On July 18, 2007, Krysiak e-mailed Curtis Creed, another employee at Dow Corning, that Beauty Manufacturing was looking for pricing information for "DC 749 Fluid." However, DC 749 Fluid is actually the Dow Corning trade name for Cyclopentasiloxane and Trimethylsiloxysilicate rather than Dimethicone. On July 19, 2007, Creed e-mailed Sarah White Kenyon at Ashland and told her that Beauty Manufacturing would be purchasing "DC 749 Fluid." Because of Dow Corning's mistake, Ashland believed that Beauty Manufacturing wished to purchase DC 749 instead of DC 593.

Starting on July 24, 2007, Beauty Manufacturing sent purchase orders to Ashland for Dimethicone. In its purchase orders, it referred to the chemical it wanted as "Dimethico/Trimethyl50056600." The purchase orders also noted that Beauty Manufacturing's item number for Dimethicone was "113526." But because of the e-mail from Dow Corning, Ashland believed that Beauty Manufacturing was actually

seeking to purchase DC 749.  As a result, Ashland linked Beauty Manufacturing's item number of 113526 with DC 749 in its internal computer system.

After each purchase order, Ashland sent Beauty Manufacturing order confirmations and invoices.  In these documents, Ashland described the chemical that would be shipped as "113526" and "DC 749."  Ashland eventually shipped drums of DC 749 to Beauty Manufacturing.  While the evidence was unclear as to what documentation accompanied the drums of DC 749 when they arrived at Beauty Manufacturing, the order confirmations and invoices did refer to the drums as containing DC 749.  This documentation also contained 113526, Beauty Manufacturing's item number for Dimethicone, as well as purchase order numbers that corresponded to the orders Beauty Manufacturing submitted.  In total, Ashland shipped 24 drums of DC 749 to Beauty Manufacturing.

During the relevant time period, Beauty Manufacturing had a number of procedures in place to assure that it was receiving the chemicals that it had ordered. The workers who received the chemicals from Ashland would compare the purchase order numbers and item numbers against the purchase orders Beauty Manufacturing had sent out.  Moreover, each batch of the chemical was compared against a sample taken from the first batch of DC 749 sent by Ashland.  However, Beauty Manufacturing did not compare the Dow Corning trade name (DC 749) listed on the shipped materials with the trade name of Dimethicone stated on the Mary Kay raw

specification sheet (DC 593).  Beauty Manufacturing also did not compare the chemical shipped by Ashland against the Dimethicone that Mary Kay itself had sent for the pilot batch.

Between 2007 and 2009, Beauty Manufacturing manufactured the CTP product using DC 749 instead of Dimethicone.  During this time, Beauty Manufacturing sold this defective product to Mary Kay.  In early 2009, however, after Mary Kay had received complaints from its customers regarding the CTP product, Mary Kay and Beauty Manufacturing conducted a joint investigation to discover the source of the problems.  From this investigation, Beauty Manufacturing learned that it had been using DC 749, instead of DC 593, in the manufacture of the CTP product.

As a result, Mary Kay received a credit from Beauty Manufacturing for $167,448.00, which Mary Kay subsequently exhausted.  Beauty Manufacturing also returned two remaining drums of DC 749 to Ashland, which together were valued at $12,356.54.  Finally, Beauty Manufacturing incurred $51,211.89 in costs associated with the destruction of the remaining defective CTP product.

After it discovered the mistake, Mary Kay audited all aspects of Beauty Manufacturing's business.  As a result of the audit, Mary Kay stated that Beauty Manufacturing's "approval status" at that time was "acceptable, but needs improvement."  In particular, Mary Kay determined that Beauty Manufacturing's

incoming materials controls needed improvement.  Before the audit, Beauty

Manufacturing had "[n]o requirement to compare a supplier Certificate of Analysis to

Mary Kay Specification upon receipt," and "[c]urrent Mary Kay raw material

standards [were] not available in the [Quality Control] Laboratory."

As a result of the mixup, Beauty Manufacturing brought this case against

Ashland to recover for the injuries that it allegedly suffered.  First, Beauty

Manufacturing seeks to recover $136,533.72 for the amount it paid to Ashland for

the DC 749.  Included in this amount is $12,356.54, which is the value of two drums

of unused DC 749 that Beauty Manufacturing returned to Ashland.  Ashland had

issued Beauty Manufacturing a credit memo for this amount, but has not directly

reimbursed Beauty Manufacturing.  Beauty Manufacturing and Ashland no longer do

business with each other.  Second, Beauty Manufacturing seeks recovery of

$167,448.00, which is the credit that Beauty Manufacturing gave to Mary Kay for

selling it the defective CTP product.  Third, Beauty Manufacturing claims

$51,211.89 as reimbursement for the costs it incurred in destroying the defective

CTP product.

## II.  APPLICATION OF LAW TO FACTS

In this case, Beauty Manufacturing has asserted three claims against Ashland:

(1) breach of contract, (2) breach of warranty, and (3) violations of the Texas

Deceptive Trade Practices Act ("DTPA").  For the reasons set forth below, the court

concludes that Beauty Manufacturing has proven its claim of breach of contract but has failed to prove its claims of breach of warranty and violations of the DTPA.

A.   Breach of Contract

1.   *Content of the Contract*

In Texas, there are four essential elements to a breach of contract claim: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.--Houston [14th Dist.] 2005, pet. denied)).  Contracts that deal with the sale of goods are governed by the Uniform Commercial Code ("UCC"), which has been adopted by the state of Texas in its Business and Commercial Code.  *See* TEX. BUS. & COM. CODE § 2.102, *et seq.*  Because the ingredient sold by Ashland are "things . . . which are movable at the time of identification to the contract for sale," *id.* § 2.105(a), the UCC applies in this case.

Under Section 2.206(a)(2), "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods."  A seller delivers conforming goods when the goods "are in accordance with the obligations under the contract." *Id.* § 2.106(b).  "The obligation

of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." *Id*. § 2.301.

To determine whether a seller delivered conforming goods, and thus fulfilled its obligations under the contract, a court must determine what the seller's obligations under the contract were. Under Section 2.202, "[t]erms with respect to which the confirmatory memoranda of the parties agree . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." However, when "the confirmatory memoranda of the parties" do not agree, courts can look outside the contract to interpret its terms. See *id*. Moreover, even when the "confirmatory memoranda of the parties" do agree, those terms can "be explained or supplemented" using evidence of "course of performance, course of dealing, or usage of trade." *Id*. § 2.202(1).

In this case, the court concludes that the contracts at issue in this dispute were for Dimethicone/DC 593, and not DC 749. The purchase orders that Beauty Manufacturing sent to Ashland clearly state a request for "Dimethicone/Trimethyl50056600." There is no written evidence that Beauty Manufacturing ever requested Cyclopentasiloxane & Trimethylsiloxysilicate or DC 749, and there was no reason for Beauty Manufacturing to order anything but Dimethicone. Ashland did introduce some evidence that Sterling orally requested DC 749, but the court finds this evidence unpersuasive in light of the written

evidence.  Because Ashland shipped DC 749, and not Dimethicone, Ashland

breached the contracts between it and Beauty Manufacturing.

2.  *Breach of Contract for Non-Revoked Goods*

Ashland argues that because Beauty Manufacturing accepted the non-

conforming DC 749 and failed to revoke its acceptance, it is precluded from

recovering for breach of contract.  In support of this proposition, Ashland cites *United

Galvanizing, Inc. v. Imperial Zinc Corporation*, No. H-08-0551, 2011 WL 11185 (S.D.

Tex. Jan. 3, 2011).  In that case, the court held that "[o]nce a buyer accepts the goods

and can no longer revoke that acceptance, he is limited to recovering under § 2.714 of

the UCC for breach of warranty if the goods are defective or non-conforming." *Id*. at

*9; see also *Trident Steel Corporation v. The Wiser Oil Co.*, 223 S.W.3d 520, 526 (Tex.

App.--Amarillo 2006, pet. denied) ("[I]t is the buyer's acceptance or rejection of

goods [that] determines the remedies available to the buyer, not the seller's mere

delivery of something."); *Toshiba Machine Company, America v. SPM Flow Control, Inc.*,

180 S.W.3d 761, 771 (Tex. App.--Fort Worth 2005, pet. granted, judgm't vacated

w.r.m.).  The court in *United Galvanizing* based its holding on the proposition that

while "a breach of contract occurs when a seller fails to deliver as promised[,]" "[a]

breach of warranty occurs when the seller delivers nonconforming or defective goods."

*Id*.

There are a number of problems with Ashland's argument. First, Section 2.714 does not deal only with breaches of warranty -- it also provides a remedy for breaches of contract. Section 2.714(a) states that "[w]here the buyer has accepted goods . . . he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." The official comments to Section 2.714 state that "[t]he 'non-conformity' referred to in [Section 2.714(a)] includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract."

Second, other courts have recognized that the separation between breach of contract and breach of warranty claims is not entirely clear. It is true "that many Texas courts have [held] that a breach of contract claim may be asserted only when the seller fails to deliver the goods at all, whereas a breach of warranty claim exists when the seller delivers and buyer accepts but later discovers that the goods are defective or non-conforming." See *Contractor's Source Inc. v. Hanes Companies, Inc.*, No. 09-CV-0069, 2009 WL 6443116, at *5 (S.D. Tex. Dec. 29, 2009). However, "the distinction between these two remedies has been blurred, by Texas courts as well as those in other jurisdictions interpreting the UCC provisions incorporated into their codes." *Id.* (citing *Morgan Buildings and Spas, Inc. v. Humane Society of Southeast Texas*, 249 S.W.3d 480, 491 (Tex. App.--Beaumont 2008, no pet.)); see also *Jetpac Group,*

*Limited v. Bostek, Inc.*, 942 F.Supp. 716, 720 (D. Mass.1996) (explaining that the difference between breach of contract and breach of warranty is whether the non-conformity arises under general ideas of warranty or under the specific obligations of the agreement).

Third, there is nothing in the UCC that suggests that once a buyer accepts and cannot revoke, it cannot recover for breach of contract. For example, Section 2.711 defines a buyer's rights when a "seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance." Under this provision, it is clear that a buyer cannot recover if it has accepted the goods but failed to revoke that acceptance. However, Section 2.714 does not say that revoking acceptance is a condition for recovering under that provision. Instead, the only requirement for recovering under Section 2.714(a) is that the buyer fulfill the requirements of Section 2.607(c). The relevant portion of Section 2.607(c) is subsection (1), which states that "[w]here a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

Ashland argues that the court's interpretation of the UCC renders Section 2.608(b) meaningless. Section 2.608(b) explains that revocation of acceptance must occur within a reasonable time, as well as "before any substantial change in condition of the goods which is not caused by their own defects." *Id*. However, as explained

above, buyers who justifiably revoke their acceptance can recover under Section

2.711, where the buyer may "cancel," "recover[] so much of the price as has been

paid, "cover" under Section 2.712, and "recover damages" under Section 2.713.

Moreover, a buyer that justifiably revokes its acceptance also gains a security interest

in goods in his possession or control to recover payments paid and various other

costs.  TEX. BUS. AND COM. CODE § 2.711(c).  By contrast, Section 2.608 has nothing

to do with the recovery under Section 2.714, under which a buyer can recover "for

any non-conformity of tender the loss resulting in the ordinary course of events from

the seller's breach as determined in any manner which is reasonable."

        In this case, it is clear that Beauty Manufacturing accepted the DC 749 that

Ashland shipped.  See *id.* § 2.606.  Furthermore, it is clear that Beauty

Manufacturingnever revoked its acceptance of the DC 749 under Section 2.608,

because no revocation occurred "before any substantial change in condition of the

goods which is not caused by their own defects."  As a result, it is foreclosed from

recovering under Section 2.711.  However, the fact that Beauty Manufacturing did

not revoke its acceptance has no bearing on its ability to recover under Section

2.714(a).

### 3.  *Discovery of the Breach*

        In order to recover for breach of contract under 2.714(a), a buyer must give

timely notification of the breach under Section 2.607(c).  Timely notification of a

breach is "within a reasonable time after he discovers or should have discovered any breach." TEX. BUS. AND COM. CODE § 2.607(c)(1). If a buyer fails to do so, he will "be barred from any remedy." *Id*. Moreover, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted." *Id*. § 2.607(d).

In this case, there is no dispute that Beauty Manufacturing notified Ashland of the breach within a reasonable time after its actual discovery of the mixup. Instead, the question is whether Beauty Manufacturing should have discovered Ashland's breach earlier than it actually did. If Beauty Manufacturing should have discovered the breach much earlier than when it actually did, then it failed to notify Ashland of the breach within a reasonable time, and therefore is barred from any remedy.

After reviewing the evidence presented, the court concludes that Beauty Manufacturing fulfilled its obligation under Section 2.607(c), because there is no indication that it should have discovered the breach any earlier than it did. First, it was reasonable for Beauty Manufacturing to assign Dimethicone a unique item number (113526), since this is the apparent practice in the industry.[*] Beauty Manufacturing did check to see that 113526 was on each shipment made by Ashland, and compared each shipment to the purchase order that it had submitted. Second, it

---

[*] While Beauty Manufacturing referred to Dimethicone and Trimethylsiloxysilicate via item number 113526, Mary Kay referred to it as 50056600, Dow Corning and Ashland as DC 593, and General Electric ("GE") as Silicone SS4267. Considering the five different ways these companies referred to the same chemical, it is not surprising that Ashland became confused.

was reasonable that the workers at Beauty Manufacturing ignored the Dow Corning trade name listed on the drums and accompanying documents, and only paid attention to the company's unique item number.  On a daily basis, Beauty Manufacturing dealt with hundreds of chemicals, each with many different names and numbers.  Third, Dimethicone and DC 749 are themselves very similar substances, with nearly identical appearance, color, viscosity, and smell.  Only with extensive testing could Beauty Manufacturing have determined that the substance shipped by Ashland was not Dimethicone.  Finally, the fact that Beauty Manufacturing used DC 749 in the CTP product, and Mary Kay purchased this product, for nearly a year and a half suggests that it was not immediately obvious that Beauty Manufacturing was using the wrong material.

To be sure, Beauty Manufacturing could have caught Ashland's mistake long before Mary Kay informed it of the problem in early 2009.  First, Beauty Manufacturing could have compared the trade name that appeared on the shipments, order confirmations, and invoices from Ashland (DC 749) with the trade name listed on the Mary Kay raw specification sheet for Dimethicone (DC 593).  Second, Beauty Manufacturing could have done tests that compared the chemical that Ashland shipped with the Dimethicone that Mary Kay had sent Beauty Manufacturing. Finally, if it is assumed that there was some documentation with the shipment that listed the chemical name of the ingredient shipped (Cyclopentasiloxane and

Trimethlylsiloxysilicate), Beauty Manufacturing could have compared that name with the chemical name of the ingredient that it wanted (Dimethicone and Trimethylsiloxysilicate).

However, Section 2.607(c) bars recovery for buyers if they *should* have discovered the breach earlier than when they did, and not if they *could* have discovered it earlier. While Beauty Manufacturing might have discovered the fact that it was wrongly using DC 749 in the manufacture of the CTP product, its actions were reasonable enough to allow it to meet the requirements under Section 2.607(c), and therefore, to recover under 2.714(a).

B. <u>Breach of Warranty</u>

To make out a claim for a breach of warranty, a buyer must establish each of the following five elements:

> 1) an affirmation or promise made by the seller to the buyer; 2) that such affirmation or promise was part of the basis for the bargain, *e.g.*, that the buyer relied on such affirmation or promise in making the purchase; 3) that the goods failed to comply with the affirmation or promise; 4) that there was financial injury; and 5) that the failure to comply was the proximate cause of the financial injury to the buyer.

*Lindemann v. Eli Lilly and Company*, 816 F.2d 199, 202 (5th Cir. 1987) (citing *General Supply & Equipment Company v. Phillips*, 490 S.W.2d 913, 917 (Tex. Civ. App.--Tyler 1972, writ ref'd n.r.e.); *see also* Tex. Bus. & Com. Code § 2.313.

As the Fifth Circuit explained in *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Insurance Company*, 832 F.2d 1358, 1375 (5th Cir. 1987), there is a difference "between promises which are merely terms of the contract and promises which rise to the level of warranties." While a "contract term identifies what is being sold," "warranties describe attributes, suitability for a particular purpose, and ownership of what is sold." *Lyda Constructors, Inc. v. Butler Manufacturing Company*, 103 S.W.3d 632, 637 (Tex. App.--San Antonio 2003, no pet.). As a result, this court adopts the position of the court in *Contractor's Source*:

> [W]here the non-conformity alleged relates to the specific obligations of the seller under the terms of the contractual agreement, the buyer's remedies fall primarily under a breach of contract claim. If, however, the non-conformity arises solely from the seller's express or implied warranties outside of its contractual obligations, or from generally defective goods, the buyer's sole remedy is for breach of warranty.

*Contractor's Source*, 2009 WL 6443116 at *6.

In this case, Beauty Manufacturing argues that Ashland made "an affirmation or promise" that it was shipping Dimethicone by placing the number 113526 on its order confirmations, invoices, and shipping materials. While the number 113526 is in some ways an "affirmation or promise," the court concludes that this case is better understood as a breach of contract case and not a breach of warranty case. This is because the failure of Ashland to deliver Dimethicone is really a breach of the contract's requirement that Beauty Manufacturing receive Dimethicone. Because

placing 113526 on the written materials does not "describe attributes, suitability for a particular purpose, [or] ownership of what is sold," Beauty Manufacturing's claim for breach of warranty fails.

## C.  Texas Deceptive Trade Practices Act

The Texas Supreme Court has "repeatedly held that a mere breach of contract, without more, is not a DTPA violation." *Rocky Mountain Helicopters, Inc. v. Lubbock County Hospital District*, 987 S.W.2d 50, 53 (Tex. 1998) (citing *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14-15 (Tex. 1996); *La Sara Grain Co. v. First National Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984); *Ashford Development, Inc. v. USLife Real Estate Services Corporation*, 661 S.W.2d 933, 935 (Tex. 1983)).

In this case, Beauty Manufacturing brought claims against Ashland under the DTPA.  TEX. BUS. & COM. CODE §§ 17.41-63.  In particular, Beauty Manufacturing claims Ashland:  (1) breached "an express warranty" under Section 17.50(a)(2); (2) misrepresented the "characteristics" and "uses" of the ingredient, under Section 17.46(b)(5); and (3) misrepresented that the ingredient provided was of the "style" requested, under Section 17.46(b)(7).

However, this is a simple breach of contract case, based on a misunderstanding over which chemical one company wished to purchase from another company. Because Beauty Manufacturing has presented no evidence why this is more than a breach of contract claim, its DTPA claim against Ashland fails as well.

- 17 -

III.  <u>DAMAGES</u>

Under Section 2.714, Beauty Manufacturing is entitled to damages for its

breach of contract claims "as determined in any manner which is reasonable."  Having

reviewed the evidence in this case, the court concludes that Beauty Manufacturing is

entitled to $231,016.43 in damages.  This amount consists of three components:

> (1)  $167,448.00, which is the amount of the damages
> sustained by Beauty Manufacturing when it gave Mary Kay
> a credit for the defective CTP product.
>
> (2)  $51,211.89, which is the cost that Beauty
> Manufacturing incurred to destroy the remaining defective
> CTP product.
>
> (3)  $12,356.54, which is the cost of the two drums of DC
> 749 which Beauty Manufacturing paid for, but returned to
> Ashland unused.

The court concludes that Beauty Manufacturing is not entitled to recover the

amount of money that it paid to Ashland for the DC 749 that it actually used in the

making of the defective CTP product.  Beauty Manufacturing accepted the DC 749,

did not reject or revoke its acceptance, and used the chemical for nearly a year and a

half to produce a product that it sold to Mary Kay.  *See also* TEX. BUS. AND COM.

CODE § 2.607(a) ("The buyer must pay at the contracted rate for any goods

accepted.").  As a result, Beauty Manufacturing is not entitled to recover its payments

for the DC 749 that it used.

## IV.  ATTORNEYS' FEES

As the court stated at trial, attorneys' fees will be dealt with as a post-trial

matter.  As a result, if Beauty Manufacturing seeks to recover attorney's fees, it will

have no later than **February 27, 2012** to file a motion for fees.

## V.  CONCLUSION

1.      The court concludes that Ashland breached its contracts with Beauty

Manufacturing for the sale of 24 drums of Dimethicone and that it timely notified

Ashland of the breach.

2.      Beauty Manufacturing is entitled to $231,016.43 in damages for this

breach of contract.

3.      The court concludes that Ashland did not breach any express warranties

under Section 2.313.

4.      The court concludes that Ashland did not violate any of the

requirements of the Texas Deceptive Trade Practices Act.

5.      Judgment will be entered for Beauty Manufacturing in accordance with

these findings and conclusions.

        **SO ORDERED**.


January 27, 2012.

A. JOE FISH

**Senior United States District Judge**

- 19 -